See Lamb v. Parkman [Case No. 8,020].

## Case No. 3,028.

### The COLORADO.

[Brown's Adm. 393.][1]

District Court, E. D. Michigan. July, 1871.[2]

COLLISION IN A FOG — SPEED — LOOKOUT—SUFFICIENCY OF WATCH—INEVITABLE ACCIDENT.

1. A propeller of 1,400 tons burden, navigating Lake Huron in the usual track of vessels, in a dense fog, should have at least two men at the wheel, and two competent lookouts, experienced in the navigation of those waters.

2. A steamer should adopt such a rate of speed in a fog as will place her headway under such easy and ready command that she can be stopped within such distance as other vessels can be seen from her, on the assumption that such vessels will do their duty in apprising her of their proximity.

[Cited in Ellis v. The Katy Wise, Case No. 4,404; The City of Panama. Id. 2,764; The Pennsylvania, 12 Fed. 917; The John Hopkins, 13 Fed. 188; The Rhode Island, 17 Fed. 558.]

[See note at end of case.]

3. The chief officer of a steamer running in a fog should be so placed that he can have instant access to and command of the signals to the engineer.

4. An erroneous order, given in the midst of confusion and consternation incident to sudden peril, is not a fault.

5. A crew cannot be held in fault for abandoning a vessel when her injury is of such a character as to afford reasonable apprehension that all efforts to save her will be unavailing and perilous.

In admiralty. Libel for collision by Elon W. Hudson, owner of the bark H. P. Bridge.

The collision occurred between eleven and twelve o'clock at night, on the eleventh day of May, 1869, on the westerly side of Lake Huron, opposite Saginaw bay, and about midway between Point aux Barques and Thunder Bay lights. The bark was bound down, on a voyage from Milwaukee to Buffalo, with a cargo of about 30,000 bushels of oats and 65,000 brick, and the propeller was bound up, on a voyage from Buffalo to Chicago, with about one-third of a cargo of general merchandise. The wind was about south, and for some time before the collision the bark had been sailing by the wind on the starboard tack, close-hauled, her course being about southeast by east while on that tack. She kept that course till a moment before the collision, when her wheel was put hard a-starboard. The course of the propeller was about north northwest, which course she kept

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

[2] [Affirmed by the circuit court. See note at end of case. Decree of circuit court affirmed by supreme court in The Colorado, 91 U. S. 692.]

until a very short time before the collision, when her wheel was ordered hard a-port. Before that order had been fully obeyed, however, it was countermanded, and the wheel was ordered hard a-starboard, which latter order was fully obeyed, and the collision occurred almost immediately after. The propeller struck the bark near the main-mast, on the starboard side, at an angle variously estimated by the witnesses from forty degrees from the bark's stem to a right angle. The truth was somewhere between these extremes, and probably nearer forty-five degrees. At the time of the collision there was a fog, which was then and for about an hour before had been so thick that it was difficult to distinguish a vessel's lights at any considerable distance. From the time the fog set in, and up to the collision, the bark had blown her fog-horn, and the propeller had blown her steam whistle, regularly, as required by law; and just as those in charge of the bark saw the propeller coming down upon her, the bark's fog-bell was rung.

By a custom adopted and used by sailing vessels on the lakes, and well understood by experienced mariners, and competent to navigate those waters, a single blast of the fog-horn, at proper intervals, signifies a vessel on the port tack, close-hauled, and a double blast, at like intervals, a vessel on the starboard tack, close-hauled. By these signals and the direction of the wind, with the exercise of reasonable diligence, the location and course of approaching vessels can always be determined with reasonable certainty before the vessel or her lights can be seen. In this case, the bark being on the starboard tack, close-hauled, sounded her fog-horn in double blasts, pursuant to the custom. The bark had taken in her light sails and her fore-sail, and at the time of the collision was proceeding at a slow speed. The propeller's speed had also been slackened when the fog set in down to three to five miles an hour, as variously estimated by the witnesses on the part of the propeller. The proof showed that the bark's fog-horn could be heard against the wind at least a half a mile. The propeller's whistle was heard on the bark for several minutes—nearly an hour, according to the testimony of the master of the bark—before the collision. The bark's horn was not heard on the propeller, or, if heard, was not distinguished from other horns in the vicinity; or, if heard and distinguished, was not reported or noticed on the propeller, until a very short time—not more than one minute and a half, by the highest estimates, and probably not to exceed one minute—before the collision. When the bark's horn was first heard on the propeller, it was apparently dead ahead and very close by. When first heard it was understood on the propeller as a single blast, indicating, as we have seen, a sailing vessel on the port tack, close-hauled. It was then that the order hard a-port was given on the propeller, which was correct if

the horn had been correctly understood, but wrong according to the true state of the case. Before this port order had been fully obeyed, however, the horn was again heard on the propeller, and correctly understood. It was then that the order to port was countermanded, and the order hard a-starboard was given and executed. When the bark's horn was first recognized on the propeller, the officer in charge of her navigation was standing in front of the pilot house, and where he had no means of signaling the engineer. As he gave the order to port, he started and ran upon the pilot house, the nearest place where he could signal the engineer, and at once signaled that officer to stop the engines, which was done as soon as the order could be obeyed. So the engines were stopped between the times the order to port and the order to starboard were given. Immediately upon giving the order to starboard, the signal was given to back the port engine, but just at this moment the green light of the bark being seen from the propeller, right under her bows, or not to exceed fifty to seventy-five feet off, the signal was given to back both engines, both of which signals were obeyed. The time between the signals to back with both engines and the collision is variously estimated by the witnesses, some putting it immediately and some as long as one minute. But taking into consideration all the circumstances, especially the close proximity of the vessels when the order was given, and the headway the propeller evidently still had when the collision occurred (judging from the severity of the blow), it must have been almost immediately, or but a very few seconds at most. The officers and crew of the bark got on board the propeller at once, and the latter stood by the bark for about an hour, during which time she remained afloat. The bark then drifted away from the propeller and passed out of sight, either in the fog or by sinking, it being uncertain which, and has never been seen since.

As to the extent of the injury there was considerable conflict. Those on board the bark estimated the extent of the cut into her side at from eight to ten feet. But in the alarm of the moment, and in their hurry to leave what they considered a sinking ship, it was argued they would be quite likely to make an overestimate. It was insisted it was not probable that the bark would have remained afloat as long as she did with so extensive a breach in her side, notwithstanding the buoyancy of a portion of her cargo. The court held it abundantly proven that the injury was considerable, and sufficient to cause the bark to sink. At all events, the bark and her entire cargo were lost; and that such loss was directly attributable to the collision was not seriously questioned. The damages claimed are $33,625.

The libel charged the propeller with the following specific faults: 1. Not properly manned. 2. Officers and crew not at their

proper places and attentive to their duty. 3. No competent lookout. 4. Too great speed. 5. That she did not take timely and efficient precautions to avoid the bark. The only denials and allegations of the answer, by way of defense, were the following: "The said respondents allege that the said collision happened without any fault or negligence, or want of care or want of skill on the part of the said propeller, or any of her officers or crew; and they allege that the same was caused (if any fault existed on the part of either vessel) from the fact that, as appears from the said libel, the fog signal of the propeller being heard on the said bark, and both vessels being in a fog, the said bark might have avoided and kept out of the way of the said propeller, which she did not do; or from the fact that the said bark had no proper lookout, or did not have a proper fog signal, or did not properly use and sound the same; or from the fact that the said bark was (as in fact she was), at and before the time of said collision, unseaworthy, overloaded and unmanageable. The said respondents allege, however, that they are ignorant of and as to what was done on board the bark, but expressly charge, as aforesaid, that if any fault existed on the part of either vessel, such fault was upon the part of the bark, her officers and crew."

After detailing the circumstances of the propeller standing by the bark, and the latter remaining afloat so long as she did, and alleging offers of assistance on the part of the propeller, the answer concluded as follows: "That the said officers and crew of the said bark neglected and refused to return to said bark, and neglected and refused to take any steps to save the said bark and her cargo from loss, and that by reason of such abandonment of the said bark by her officers and crew, and their aforesaid refusal and neglect, and by reason of the said bark being, as aforesaid, unseaworthy, overloaded and unmanageable, and by reason of fault heretofore charged on the part of said bark, and not by reason of any fault, negligence, or any other matter in the said libel alleged upon the part of said propeller, her officers and crew, said bark and her cargo were lost, as the said respondents are informed and believe." Most of the matters set up in the answer were insisted on at the hearing as defenses, but the defense which was mainly contended for, and the most strenuously urged, was one not specifically claimed in the answer, viz., that the collision was the result of inevitable accident.

H. B. Brown and J. S. Newberry, for libellant.

W. A. Moore, for claimant.

So far as the propeller is concerned this was an inevitable accident. 1 Pars. Shipp. 525; The Virgil, 2 W. Rob. Adm. 201, 205; Union S. S. Co. v. New York & V. S. S. Co., 24 How. [65 U. S.] 307, 313, 319; Stainbach v. Rae, 14 How. [55 U. S.] 532, 536, 538; Peck v. Sanderson, 17 How. [58 U. S.] 178, 182; The Morning Light, 2 Wall. [69 U. S.] 550, 554, 560; The Grace Girdler, 7 Wall. [74 U. S.] 196, 203.

Geo. B. Hibbard, on the same side.

The watch on the propeller's deck was complete. (1) In cases where inevitable accident is claimed as a defense, as in all others, the burden of proof is on the libellant to show a fault. The Bolina, 3 Notes of Cas. 208, 210; The Marpesia, L. R. 4 P. C. 212. (2) A fault cannot be established unless it be made to appear the propeller violated some law, regulation, rule, or custom. This the libellant has not shown. (3) It is not within the province of courts to establish rules or standards by which liability can be determined. The steamboat act of 1852 (10 Stat. 72) gave the inspectors power to pass rules and regulations. They might have adopted a rule with reference to the sufficiency of a watch in a fog, as they actually have done with respect to steam whistles. 1 Pars. Shipp. 590. They regarded "great caution" necessary only in crowded channels or the vicinity of wharves. To permit the court to make the rule would be to determine there was no rule, as judges would differ in opinion as to the sufficiency of a watch. (4) No adjudged case requires a greater watch than the propeller had, or that the watch should be doubled in a fog. (5) When the horn was heard, it was reported to and understood by the first officer, and then the function of the lookout ceased, and he was at liberty to do as he did—aid the wheelsman. The Maria Martin, 12 Wall. [79 U. S.] 31.

The bark changed her course before the collision. The round assertion of the crew that the course was not changed will not be allowed to prevail against conceded facts, which indicate that such change must have been made. The Wenona [Case No. 17,411].

H. B. Brown, in reply.

With regard to the sufficiency of the watch, the fact that the propeller violated no express law, rule, regulation, or custom is not the proper criterion. The question is not what these require, but what does good seamanship require under article 20. The practice of carrying any lookout at all upon the lakes was not in obedience to any law or custom to that effect, but solely in consequence of the decision of admiralty courts that good seamanship required one. Before the act of 1864 none was required by statute, and shipmasters fought against it till the courts compelled them to carry one. The court must determine what a proper lookout is, and in the case of The Europa, 2 Eng. Law & Eq. 557, five seamen were adjudged insufficient.

LONGYEAR, District Judge. I shall consider first the fifth specification of fault against the propeller, viz.: That of her fail-

ure to keep out of the way of the bark. The solution of the question of fault here presented depends upon article 15 of the act of April 29, 1864 (13 Stat. 60), as applied to the facts of this case: "Article 15. If two ships, one of which is a sailing ship and the other a steamship, are proceeding in such directions as to involve risk of collision, the steamship shall keep out of the way of the sailing ship." Article 15 is general in its application. The duty it imposes attaches all the same, whether it be in the day time or in the night, in clear weather or in a fog. Its requirements are in no manner affected or modified by the provisions of article 16. Those provisions merely impose additional preliminary duties. Hence, the fact of a collision between a steamship and a sailing ship must be held prima facie evidence of fault on the part of the former, in a fog as well as in clear weather. The steamship must, of course, be apprised of the existence of the conditions upon which her duty under article 15 attaches, and she must be so apprised as to be enabled to act intelligently and effectually. These conditions are: 1. The fact that there is another ship in her vicinity. 2. That such other ship is a sailing ship; and, 3. The position and course of the latter. In the day time this is accomplished by actual observation of the vessel. In the night, it is by means of the lights every sailing vessel is required by law to carry. In a fog, whether by day or by night, it is by means of a fog-horn blown at short intervals, if under way; or the ringing of a bell, if not under way. Article 10, Act 1864, above cited. The difference is in the mode or means merely, and not in the result. In the one case, it is by the sense of sight, and in the other by that of hearing. In the eye of the law, the result in both cases is precisely the same; and the legal obligation of a steamship to see in the one case, and to hear in the other, and to govern herself accordingly, attaches precisely the same in the one case as in the other. Therefore, unless it appears that the bark did not do her full duty, and that such failure on her part contributed to the collision, there is no occasion to inquire into the details of the conduct and manoeuvres of the propeller because, in such case, the fault of the latter consists in the fact that she did not keep out of the way of the former. The first inquiry, therefore, is as to the conduct of the bark.

There is no dispute but that the bark kept her course, as she is required to do by article 18 of the act of 1864, up to the time she put her helm hard a-starboard. This was done in the midst of the confusion and consternation incident to the sudden peril in which the bark was placed by the propeller, the latter then being almost upon her. Even if the starboard order was an error, it was therefore not a fault to which any responsibility can be attached. That the bark's lights were properly set and brightly burning, that she was properly manned and equipped, that her officers and crew were properly placed and attentive to duty, and that her fog-horn was properly sounded, are fully made out by the proofs, and are in fact undisputed. It is said, however, that the bark being apprised, as she was, of the approach of the propeller by hearing the signal blasts of her steam whistle a considerable time before the collision, she ought to have got out of the way of the propeller, and also ought to have rung her fog-bell sooner than she did, in order the more effectually to have notified the propeller of her presence and position. By article 18 the bark was required to keep her course. By article 10 she was required to use her fog-bell only when not under way. Here she was under way. The claim, therefore, is that the bark should have departed from those rules, both as to course and as to signals, and consequently that the case comes under article 19, which provides as follows: "In obeying and construing these rules, due regard must be had to all dangers of navigation, and due regard must be had to any special circumstances which may exist in any particular case rendering a departure from the above rules necessary in order to avoid immediate danger."

The danger of navigation which was then present—the fog—was one that was expressly provided for by articles 10 and 16, and with reference to which, as well as article 18, the bark was acting. This she had a perfect right to do, unless some of those special circumstances mentioned in article 19 should have arisen and come to her notice, requiring a departure from the rules. The special circumstances in this case, to which the collision is directly attributable, are the failure of the propeller to hear, and when she did hear, at first to rightly understand the bark's signal, and her failure to stop her headway in time to avoid a collision after she did correctly understand those signals. There is not, and cannot be, any pretense that the bark had any notice or intimation whatever that the leviathan which was in her vicinity was not provided with ears to hear her warning signals, or having ears, would fail to put them to their proper use, or would approach so near before taking any measures to avoid her, that when taken they would be ineffectual. Neither is there any ground to claim that she could have known the propeller was coming down upon her sooner than she did know it. And when she was made aware of it, it was clearly too late for any effective action on her part. She did what, in the alarm incident to the suddenness of the peril thus brought upon her, and without her fault, was thought best, but to no avail. For her to have changed her course before this would have been in violation of article 18; and for her to have rung her bell sooner that she did would have been in violation of article 10, either of which would

have constituted a fault for which she might have been held responsible if a collision had still occurred. It is true, after the danger had become imminent, and in fact the collision was inevitable, her wheel was put to starboard, and her bell was rung, but, as we have already seen, these acts, even if erroneous, cannot be attributed as faults under the circumstances.

It is also claimed that the injury was but slight, and that the bark was unnecessarily abandoned by her officers and crew. The proofs clearly show that the injury was of a serious character and sufficient to sink the vessel, and that the loss of the vessel and cargo were directly attributable to that cause. It is true she remained afloat for an hour at least, but she was a long distance from shore and on very deep water, and her injury was of such a character as to afford reasonable apprehension, to say the least, that all efforts to save her would be unavailing, and could only result in peril to those who should undertake it. It would be unreasonable to require the crew of a vessel to remain upon her under such circumstances.

The bark, then, being in no manner in fault, the only defense that remains to be considered is that raised upon the argument, viz.: That the collision was the result of inevitable accident; and this, as we shall see, involves a consideration of the particular conduct and manoeuvres on the part of the propeller, including the question of speed. "Inevitable accident" is defined by Dr. Lushington to be "that which the party charged with the offense could not possibly prevent by the exercise of ordinary care, caution and maritime skill." The Virgil, 2 W. Rob. Adm. 201. Our own supreme court defines it to be "where a vessel is pursuing a lawful avocation in a lawful manner, using proper precautions against danger, and an accident occurs." "The highest degree of caution," say the court, "that can be used is not required. It is enough that it is reasonable under the circumstances." The Grace Girdler, 7 Wall. [74 U. S.] 203; see, also, The Pennsylvania, 24 How. [65 U. S.] 307, 313; The Washington, 14 How. [55 U. S.] 532, 536; The Morning Light, 2 Wall. [69 U. S.] 550, 554, 560. It becomes necessary, therefore, next to inquire whether reasonable care, caution and maritime skill were exercised on the part of the propeller under the circumstances.

The propeller was a large vessel, being of upwards 1,400 tons burden. She was in waters frequented by other vessels, and was in fact in the vicinity of other vessels at the time, as indicated by the fog-horns heard on board of her. She was so proceeding in a fog, in which other vessels could be seen but a short distance, on which account emergencies were likely to arise, in which a sudden change of course would become necessary to avoid accidents, which,

as the proof shows, would require two men at the wheel to accomplish with reasonable celerity. She was so proceeding, too, with fog-horns sounding from vessels on nearly all sides of her, requiring close scrutiny to distinguish any one of them from the others. With a full knowledge of all these facts on the part of those in charge of her navigation, we find the propeller proceeding at a rate of speed which I think the proof clearly shows to have been not much, if any, less than five miles an hour, and with a watch of only four persons, consisting of the mate in charge, one man at the wheel, one man on the lookout forward, and one engineer—a watch barely sufficient on such a vessel on the clearest night—and, we may add, the master, although notified of the peril, calmly reposing in his stateroom.

And then, when the crisis comes, and seconds assume the magnitude of minutes in estimating the time within which the headway of the propeller must be stopped in order to avoid the catastrophe, we find the officer in charge of the deck out of reach of the means provided for signaling the engineer to stop and reverse.

Let it be borne in mind that the care and caution used must be reasonable under the circumstances. The watch on the propeller may have been a reasonable one (it certainly could have been no less and be a reasonable one), and the position of the mate in front instead of on top of the pilot house may have been a reasonable position on a clear night.

But it certainly needs no argument to show that what is barely sufficient on a clear night would fall far short of being such in a fog, with the attendant circumstances above stated. Upon a vessel of that size reasonable care and caution, under the circumstances, required two men at the wheel to insure celerity in that regard, and two competent lookouts, experienced in the navigation of those waters, to insure close scrutiny of the many signals from vessels in the vicinity, and that the officer in charge should have been where he could have instant access to, and command of, the signals to the engineer. I think this much, at least, was absolutely necessary to answer the law requiring reasonable care and caution under the circumstances. It cannot be said that those omissions did not contribute to the collision. I think it quite clear from the proofs that they did.

1. According to the proofs, the propeller came within the sound of the bark's fog-horn when at least half a mile distant. Why was it not heard, or, if heard, why was it not distinguished from the other horns until the two vessels had arrived in such a fatal proximity that a collision was inevitable? It certainly cannot be attributed to the fog, because sound will travel as well in a fog as in a clear atmosphere, and, as is well known, is often intensified by it. It was unquestion-

ably owing to the insufficiency of the look-out, both in number and in the competency of the one on duty. An additional lookout would at least have afforded another chance of escape. And when we take into consideration the fact, as shown by the proofs, that the lookout who was then on duty was on his first trip on the lakes, and that, although an old sailor on the ocean, he was confessedly unacquainted with the use of fog-horns, the necessity of an additional lookout assumes a vastly greater importance.

2. The want of a second man at the wheel made it necessary to call the lookout from his post before the necessity of a lookout forward had ceased to exist, as the exact position of the bark had not then been made out.

3. The propeller kept her headway just as much longer than she would have done if the mate had been at his post on top of the pilot-house, as it took him to get there from where he was, which was several seconds. While the accident might not have been entirely avoided if this time had been saved, it certainly would have made the blow less severe.

4. I think, also, that reasonable care and caution were not exercised on the part of the propeller in regard to her speed. The words "moderate speed" are used in article 16 in a specific and not in a general sense. It is moderate speed in a fog that is meant. Therefore, within the meaning of the article, what would be moderate speed on a clear day or night is not necessarily such in a fog, and what would be moderate speed in a light fog, one in which objects can be seen at a considerable distance, would not be such in a denser fog in which objects can be seen at a less distance. "Moderate speed," therefore, as used in article 16, is a relative term, and whether or not it be such, must be determined, not by any certain fixed number of miles per hour, but by the particular circumstances of each case in which the question arises. By what criterion, then, shall the rate of speed be judged? The object and purpose of the rule requiring moderate speed in a fog is to avoid collisions. That object can be accomplished only by each steam vessel adopting such a rate of speed in a fog as will place her headway under such easy and ready command that she can be stopped within such distance as other vessels can be seen from her; on the assumption, however, in all cases, that such other vessels will do their full duty in apprising approaching vessels of their proximity. If the speed of a steam vessel in any given case is greater than this, it is too great, and, in case of collision, she must be held in fault, no matter what her rate of speed per hour actually is. It is believed that there is no other safe criterion by which the object of the rule can be insured. This criterion substantially has been recently adopted and applied by both the circuit and district judges in the southern district of New York, in three cases of con-

siderable importance, and to which, to say the least, it applies with no greater force than to the present case. See The Western Metropolis [Case No. 17,441]; The D. S. Gregory [Id. 4,099]; The Louisiana [Id. 8,537]. See, also, McCready v. Goldsmith, 18 How. [59 U. S.] 90, 91.

The practical application of the rule above indicated certainly cannot be difficult in actual practice. A fog is never of sudden occurrence, or, at least, never so sudden as not to afford ample time for deliberation in regulating speed. The pilot of every steam vessel ought to know, and every competent pilot, of course, does know practically within what distance his vessel can be stopped at any given rate of speed. He can also judge with practical certainty about how far off in any case in hand he can see another vessel in a fog. Here, then, he has all the data by which to regulate his speed with practical certainty, so as to insure safety to his own and to other vessels.

Now, to apply the rule to the present case: The mate testifies that upon the first intimation he had of the proximity of the bark—this, it must be remembered, was by hearing her fog-horn, and before she had yet been seen from the propeller—he instantly, or as soon as he could get to where he could do so, signaled the engineer to stop. That on hearing the two horns, which was almost immediately after, he signaled the port engine to back. That immediately after this, and for the first time, the bark's green light was seen from the propeller, when he immediately signaled both engines to back. The engineer testifies that all these orders were promptly obeyed, and that both engines continued to back, and to back strong up to the time the propeller struck the bark. Notwithstanding all this exertion, the speed of the propeller was still such, when she reached the bark, as to crush in her side, inflicting a serious and fatal injury, which shows that her speed must then have still been very considerable. Under the rule above stated, therefore, the speed of the propeller was not that moderate speed meant by article 16, as applied to the circumstances of this case.

It will not avail the respondents anything to attempt to excuse the failure of the propeller to stop in time to avoid a collision by saying that those in charge of her did not learn of the bark's proximity and position in time to do so, because, as we have already seen, that excuse itself constitutes a fault. The propeller, therefore, being in fault in the particulars above specified, the defense of inevitable accident is not admissible. It is true that fogs constitute one of the great, perhaps one of the greatest, perils of navigation, especially upon those waters constituting, as in this case, great highways of commerce, and courts should no doubt deal leniently with vessels charged with fault in cases of collision where this great peril is a contributing cause, but not so leniently as to encourage a

letting down from that reasonable degree of care, caution and diligence due in such circumstances to the safety of life and property, and the general interests of commerce.

In view of the importance which the case assumes, as well in regard to the greatness of the calamity to the libellant in the loss of his property, and the pecuniary loss to respondent if held liable, as to the general interests of navigation and commerce in having the rules as well defined as is practicable—an importance which was fully realized and ably met by the exhaustive and instructive arguments of counsel on both sides—I have given the case my closest attention and scrutiny, and endeavored to apply to it the rules of law in such a manner as not only to do simple justice between the parties, and no more, but at the same time to inflict no injury, but perhaps to be of some service to the interests of navigation and commerce generally. So applying these rules, however, I am clearly of opinion that there was such a letting down on the part of the propeller from that due and reasonable care, caution and diligence above mentioned, as to constitute a gross fault on her part, and on account of which she is responsible for the damages done by the collision complained of. Decree for libellant.

[NOTE. The cause was referred to a master to ascertain the amount of the damages, and on the coming in of his report exceptions were taken thereto by the respondent, some of which were sustained and others overruled; and the district court entered a final decree in favor of libellant for $33,675.26, with interest and costs. Case No. 3,029, next following.]

NOTE [from original report]. On appeal to the circuit court [not reported] the decree in this case was affirmed by Judge Emmons, in an oral opinion, substantially as follows:

Construing the opinion of the district judge as it should be understood, not as adjudging that each criticism made upon the management of the Colorado, pointed out faults each per se sufficient to condemn her; but considering several of them as only just observations, pointing out irregularities in addition to the leading faults for which the libel was sustained, he could fully adopt its conclusions, and the grounds both of fact and law upon which they were based. Had there been lookouts sufficient in number and character, her speed such as that her progress might have been arrested within the distance at which a light might have been discovered, with a sufficient number of men at the wheel, and all officers diligently doing their duty, he could have agreed with the learned counsel for the respondents, that it would have been an "inevitable accident." In such conditions, he would not have measured too closely the three of four seconds necessary for the officer in charge to make the bell signals, and condemn the ship owners for an error so slight as standing in front instead of upon the top of the pilot house. The latter, however, was in the opinion of experienced pilots, in the condition proved, his better place. He fully agreed with them, and mentioned this, with other minor matters of management he had referred to, only to suggest that this court did not intend to set up severe and impracticable standards in advance of precedents, and in opposition to the opinions of able seamen. The satisfactory judgment rendered by the district court in this cause clearly demonstrated this

was necessary in order to sustain the libel. Owners whose liberality furnishes full crews instead of four men, upon such a steamer, in such a night, and officers whose duty was performed in that degree which long experience has shown to be compatible with general safety, will not meet upon the bench here theories which long service never would suggest, or breakers not laid down on the charts. To the rational general views, in this regard, of the respondents' counsel, and which he so well sustained, alike upon principle and authority, assent was most fully accorded.

It was said no better rule could be declared by which lawful speed in a fog could be measured, than that laid down by the district judge. The recent cases referred to in his judgment, put into specific terms, applicable to the precise exigencies of this case, a general principle only, which numerous prior adjudications had fully established. That a steamer may run in a fog so thick as to preclude the discovery of an approaching light in time to avoid it, is a proposition which no interested owner of marine property, or any seaman not reckless of life, would ask a court to assert. With much emphasis, it was said that a lookout who did not understand the indications of the lights, horns and bells demanded by the regulations was incompetent. Various hypothetical cases were stated, illustrating the necessity of this knowledge. It was little less extravagant to say that any man with two eyes constituted a lookout, than that any other with two hands was a competent surgeon. It would be oftentimes a question of much difficulty, whether new conditions would make it the duty of a lookout to reannounce a light. Judge E. said, he had not very carefully considered whether, in the present case, the want of knowledge on the part of the lookout was a "contributory fault," and therefore, although being clearly of the opinion that he was incompetent, he nevertheless preferred to put his agreement with the district court, in this part of the case, upon a ground by which he was willing hereafter to abide. That upon a steamer of this magnitude, and in such circumstances, one was not sufficient, nor was he prepared, without further inquiry, to lay it down as a rule, that two, even in a fog, were universally necessary. Ample manning in all other particulars might render one sufficient. No intimation was given which would in future preclude the inquiry when it arose.

Although the proof was not full in this case by experts that another wheelsman was needed, he deemed such evidence unnecessary. It was one of those conceded matters, of which, like the necessity of a lookout, a competent officer of the deck, and other evidently necessary seamen, the court will take cognizance. In this very case the lookout was called from his post to assist the wheelsman, showing the necessity for his presence. In two other cases, now before the court, the same fact appears. The testimony in all is full, that when a sudden movement may be necessary, two men at the wheel are necessary. The absence of the second man was a fault.

It is not entirely clear that the incompetence of the one lookout, the absence of a second, or the want of another wheelsman contributed to this disaster. The argument that all or some of them did so is highly persuasive. The law, however, presumes they did so until the contrary is proven. It cannot be said that such proof is made by the respondents in this case. He thought the learned counsel wholly mistaken in reference to the onus probandi, after it appeared that the ship was a steamer, bound to avoid the libellant's ship, and more especially when specific faults existed. Then the presumption was they did produce the calamity. This whole question, however, was deemed of less practical importance in view of the other leading fault—too great speed—which beyond doubt was the leading cause of the calamity.

Regret was expressed that the condition of business in the court, and a temporary inability to labor save through the reading of others, precluded the preparation of a written judgment. The desire to do so, however, sprang more from a wish to consider some interesting points, learnedly discussed by counsel, and sufficiently germane to invite their consideration, than because the court was not abundantly satisfied with the mode in which the cause was disposed of in the opinion already pronounced.

This case is now awaiting argument in the supreme court.

[NOTE. Charles Ensign and others, claimants of the propeller, appealed to the supreme court, where the decree of the circuit court was affirmed for the reasons, as stated by Mr. Justice Clifford, that the evidence clearly established the freedom of the bark from fault, and conclusively showed that the disaster occurred because of the negligent navigation of the propeller. The rulings of the court on the exceptions to the master's report were likewise sustained. The Colorado, 91 U. S. 692.]